**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

FORD MOTOR COMPANY,

        Plaintiff,

v.                                    Case No. 04-CV-72525-DT

KASEY KAHNE,

        Defendant.

_____/

**ORDER GRANTING DEFENDANT'S "MOTION FOR SUMMARY JUDGMENT"
AND
DENYING PLAINTIFF'S "MOTION . . .TO FILE FIRST AMENDED COMPLAINT"**

      This civil action involves a breach of contract claim brought by Ford Motor Company ("Ford") against professional stock car driver Kasey Kahne. Kahne is currently racing in circuits sanctioned by the National Association of Stock Car Automobile Racing ("NASCAR"). Ford initially filed this case in Wayne County Circuit Court, and Defendant timely removed the case to federal court pursuant to 28 U.S.C. §§ 1441 and 1446. Ford's complaint alleges a purely state law contract claim with this court's subject matter jurisdiction predicated on diversity jurisdiction as granted by Congress under 28 U.S.C. § 1331.

      The matter is before the court on Defendant's May 12, 2005 "Motion for Summary Judgment" and Plaintiff's June 28, 2005 "Motion for Leave to File First Amended Complaint." Both motions have been briefed by the parties and, on July 20, 2005, the court held a hearing on the motions. For the reasons explained below, the court will grant Defendant's motion for summary judgment and will deny Plaintiff's motion to amend its complaint at this advanced stage of the litigation.

## I.  BACKGROUND

Dan Davis, the Director of Ford Racing Technology first met Kasey Kahne in May 2000 while attending a USCA Midget race where Kahne was participating.  (Davis Dep. at 110.)  During his deposition, Davis explained that Kahne came highly recommended, had "raw talent," and possessed strong potential for future development as a race car driver.[1]  (*See id.* at 114, 116.)  Accordingly, Ford sought to enter "into a business arrangement with [Kasey Kahne] whereby [Ford] would help develop him into a driver of a Ford product in the future," giving Kahne "some compensation to get started."  (*Id.*  at 114.)

### Kahne's First Contract With Ford Racing

Davis's efforts resulted in a September 2000 agreement between Ford and Kahne for the young driver to race with Ford or a Ford supported racing team.  (Def.'s Dep. at 21; Pl.'s Resp. Ex. 1.)  This 2000 Khane-Ford agreement was effective through August 29, 2002 "with an option to renew [the] agreement for an additional two years with similar terms, to be negotiated in 2002." (Pl.'s Resp. Ex. 1.)  The agreement also gave Ford some protection for bringing its racing resources to the table through a right of first refusal.  In essence, the contract provided Ford the opportunity to match any racing-related or driving-related employment offer that Kahne might receive during the term of the agreement.  (*Id.*)

---

[1] In addition to his experience driving midget cars ("midgets"), Kahne also has a background racing open wheel sprint cars.  Midget car racing is a form of racing involving cars of smaller dimensions than normal.  Midget cars tend to be very small with a high power-to-weight ratio.  Sprint cars are open wheel cars, often raced on dirt tracks and typically having wings mounted on top of the cars.  (*See* Def.'s Dep. at 15.)

2

After executing the 2000 contract, although Kahne had not decided whether he wanted to focus on open-wheel or stock car racing, Ford arranged for Kahne to drive in several open-wheel races, including in the Toyota Atlantic racing series.  (Def.'s Dep. at 21-22, 26-29).  The manager of Ford Racing operations, Gregory Specht, testified regarding the investments Ford made in Kahne's development as a driver while the 2000 Kahne-Ford agreement was in effect.  (Specht Dep. at 43-46.)  According to Specht, Ford hired a driving coach for Kahne, sent him to driving school, paid for Kahne to enter two Formula Ford races and three Toyota Atlantic races, provided media training for Kahne, and purchased a "shifter cart" (a form of racing go-cart) for Kahne to practice with.  (*Id.* at 43-44; *see also* Davis Dep. at 119-20.)  Ford paid Kahne's travel expenses while attending driving school and provided financial and technical support for Kahne's relatively successful participation in the 2001 USAC midget series.  (Def.'s Dep. at 38.)

Ford avers that, around November 2001, Kahne informed Ford that he was interested in stock car racing and wanted to drive in a racing series sanctioned by NASCAR.  (Davis Dep. at 120; *see* Kahne Sr. Dep. at 35.)  On the other hand, Defendant testified that Ford approached him in late 2001, informing him that Ford was in the process of working out a deal with a sponsor to place Defendant with a NASCAR Busch Series stock car team for the 2002 season.  (Def.'s Dep. at 38).  Kahne testified that he did not remember whether he expressed to Ford his desire to race stock cars at that time.  (*Id.* at 39-40.)  In either event, Ford made efforts to contact Robert Yates Racing ("RYR" or "Yates"), a Ford-affiliated organization with teams racing in the

3

NASCAR Nextel Cup Series (the NASCAR Winston Cup Series at the time),[2] to facilitate the development by RYR (and to obtain sponsorship) of a third RYR NASCAR team to race in the Busch Series with Kahne as the driver.  (*See* Davis Dep. at 120; Pl.'s Resp. Ex. 2.)

### The Kahne-Robert Yates Racing Contract

On February 4, 2002, Kahne and RYR executed a "Contract for Services" for Kahne to drive exclusively for RYR in NASCAR sanctioned racing series.  (Def.'s Mot. Br. Ex. G.)  The Kahne-Yates agreement applied to the 2002, 2003, and 2004 NASCAR racing seasons, with an option for RYR to extend the agreement for the 2005 and 2006 seasons.  (*Id.*)  The agreement also provided to RYR the sole right to determine whether Kahne would race in the NASCAR Busch or Winston (Nextel) Cup Series.  (*Id.*) It is undisputed that the only parties to this contract were RYR and Defendant.

### The Kahne-Ford 2002 Agreement

While Kahne was working out his contract with RYR, he and Ford were negotiating the contract at issue in this case (as the 2000 Kahne-Ford agreement would expire on August 29, 2002).  After lengthy negotiations between the parties, Ford and Kahne executed their second agreement, a "Personal Services Agreement" signed in May 2002.  (Pl.'s Resp., Ex. 5.)  The parties agreed that their 2002 contract would be governed by Michigan law and, unlike the 2000 contract, it did not include a right of first refusal.  The key disputed terms of the 2002 Kahne-Ford agreement are set forth below.

---

[2] Nextel Communications replaced the tobacco company R.J. Reynolds as the primary sponsor for NASCAR's premier "Cup" series beginning in 2004.

DRIVER (Kasey Kahne) agrees to participate in one or more racing series as a driver of "Ford" branded vehicles and/or Ford powered vehicles. FORD agrees to provide DRIVER with opportunities to participate in one or more mutually acceptable racing series with a reasonably competitive team.  The specific series and team will be determined jointly and will be subject to the following considerations:

a.      The Team selected will utilize Ford vehicles and/or engines and will have sponsors compatible with the business interests of FORD. The DRIVER will act as a representative of FORD and will display the FORD logos on the driver[']s suit and helmet.

b.      The DRIVER will be employed by the Team.  FORD will act on behalf of the driver to ensure that Team compensation is comparable with "FORD" drivers of similar experience and accomplishment.  DRIVER must reserve the right in the Team Agreement to allow for the option of racing in other series[ ] (schedule permitting).

c.      In the event that the relationship between DRIVER and the employing Team becomes unsatisfactory, for any reason, in the opinion of FORD, FORD has the option together with the DRIVER, to place the DRIVER with another series/team.

d.      The DRIVER is encouraged to participate in other racing events where FORD participates, e.g. NASCAR, USAC Midget, Silver Crown, Sprint Car, CART, etc.  FORD has the right to deny participation where FORD feels the team is incompatible with Company business or policy reasons, but disapproval will not be unreasonably withheld.  FORD will make every effort to accommodate DRIVER participation in mutually beneficial racing events.

e.      Participation in a series that FORD does not support (e.g. the Indianapolis 500 IRL Race) will be accommodated, where possible, by placing the DRIVER with a FORD associated team.  If no team is available, FORD would consider placement with a team that is competitive, has a record of safe operations and the team sponsors are compatible with the business interests of FORD.  FORD has

5

the right to deny participation where FORD feels the team is
incompatible with Company business or policy reasons, but
disapproval will not be unreasonably withheld.[3]

(*Id.* (footnote added).)

**The 2002 and 2003 Racing Seasons**

In 2002, Kahne raced a partial schedule in the NASCAR Busch Series for Robert

Yates Racing, but RYR (primarily a Nextel Cup racing organization), did not have the

resources to devote fully in support of its two Cup teams and a third Busch Series team.

(*See* Yates Dep. at 31, 47-49, 51-53; Davis Dep. at 162-64.)  After only a few races of

the contemplated 20 that Kahne was scheduled to complete, RYR moved Khane to

another Busch Series team so he could continue racing in the 2002 Busch season.

(Yates Dep. at 47.)  There came a time during the 2002 racing season, however, where

RYR decided that it was not going to race a Busch Series team in 2003.  (Yates Dep. at

51-52, 54.)

Without a continuing Yates NASCAR Busch team for 2003, Kahne and Yates

agreed to assign the Kahne-Yates contract for one year (the 2003 season) to Akins

Motorsports, another Ford affiliated NASCAR Busch team.  (Def.'s Mot. Ex. K (written

addendum to Kahne-Yates agreement); Yates Dep. at 54-55, 57-58.)  Under the terms

---

[3] The contract's use of a double negative in the text of consideration "c" and in
the final sentence of consideration "e" quoted above is a bit confusing.  By stating that
"Ford has the right to deny participation where FORD feels the team is incompatible . . .,
but *disapproval* will not be unreasonably withheld" the contract essential provides that
Ford's will not withhold its disapproval.  Disapproval is not ordinarily withheld.  By not
withholding disapproval, Ford would be giving its approval.  It seems to the court that
the proper and most reasonable interpretation of this confusing language is that the
parties agreed that Ford would not unreasonably exercise its described "right to deny"
participation.  When questioned about this language during oral argument, Plaintiff's
counsel offered no satisfactory or alternative explanation.  This point, however, is not
material to the court's analysis.

of the addendum modifying the 2002 Kahne-Yates agreement, RYR continued to pay Kahne his salary for the 2003 season and agreed to "loan" Kahne's services to Akins Motorsports for the 2003 season.  (*Id.*)

Kahne completed the 2003 NASCAR Busch season with Akins Motorsports. Khane and his race team performed well in 2003, finishing four times in the top five and fourteen times in the top ten.  Kahne placed seventh in the overall season points standings.  (Def.'s Mot. Br. at 6-7.)

**Kahne's Decision to Sign With Evernham Motorsports for the 2004 Season**

It is undisputed that, on October 2, 2003, Kahne, through Kasey Khane Incorporated, executed an agreement with Evernham Motorsports, LLC (a Dodge team) where Kahne would drive full-time on the NASCAR Nextel Cup Series (with the "Number 9" Dodge-UAW sponsored team).  It is also undisputed that Kahne had a successful season during 2004, winning rookie of the year honors and scoring a number of second place finishes.  The parties' versions of the story begin their great divide with regard to the events leading to Kahne's decision to race for a Dodge affiliated NASCAR Nextel Cup team.

Kahne maintains that his agreement with RYR that covered the 2004 season was voided by RYR because it could not provide him a race team in either the NASCAR Nextel Cup or the Busch series.  During the 2003 season, Kahne received from Evernham Motorsports an inquiry regarding his availability to drive full-time in the Busch and Nextel Cup Series, and claims that RYR had no plans to race Kahne in the 2004 Busch or Nextel Cup Series.  (Yates. Dep. at 65, 79; Seaborn Dep. at 52.)  William Seaborn, Vice-President of Marketing for RYR, testified that RYR communicated these

7

facts to Kahne during an August 13, 2003 lunch meeting with Robert Yates, Kahne, Rod

Moskowitz (Kahne's agent), and himself.  (Seaborn Dep. at 50-54.)  Kahne cites the

deposition testimony of Robert Yates, claiming that this testimony establishes that RYR

had handed Kahne off to Ford (under the impression that Ford was placing Kahne with

a good Busch team) and that because Yates could not offer Kahne a "good seat" in a

stock car in either the Busch or Nextel Cup Series, RYR's contract "rights were over"

and RYR had "no deal" without sponsorship to support a NASCAR Busch or Cup team

for Kahne under their agreement.  (*See* Yates Dep. at 69-73.)  After realizing that RYR

would not have a team for which Kahne could drive and that Ford was "going to take

[Kahne]," Robert Yates stated that he had "no contract."[4]  (*See id.* at 96-97.)

Kahne also avers that, without a deal to race for RYR, he wrote a letter to Dan

Davis on August 29, 2003, informing Davis that he was "ready to go to Nextel Cup in

2004."  (Def.'s Mot., Ex. R.)  The hand-written letter provided, in relevant part:

> Dear Dan,
>
> As I discussed with Greg Specht this afternoon and pursuant to my
> personal service contract with Ford[,] we are to mutually agree on the
> appropriate series for me to race in.  I have decided that I am ready to go
> to Nextel Cup in 2004.  It is my understanding that we must mutually
> agree on a competitive cup team within the next thirty days.  I look forward
> to discussing this with you shortly during our meeting in Michigan.

(*Id.*)

Kahne claims that, despite his request, Ford declined to offer him a position as a

driver for a full-time Nextel Cup Series team for 2004.  (*See* Specht Dep. at 101.)

---

[4] Elsewhere in Yates' deposition, he suggests that Kahne's rumored interest in racing for a Dodge team may have impeded RYR's ability to find a sponsor and provide a ride for Kahne under the Kahne-RYR agreement.  (*See* Yates Dep. at 99-101.)

8

Specht testified that he and Davis did not think that Kahne was ready to race in the Nextel Cup Series on a full-time basis and that they did not "endeavor to secure a full-time Nextel Cup ride [for Kahne] in 2004." (Specht Dep. at 109-111.) By letter dated September 24, 2003, Davis informed Kahne of Ford's view that he was not ready for a full-time Nextel Cup ride, detailing Ford's position that Kahne's development would be better served by racing primarily in the NASCAR Busch Series. The letter provided in pertinent part:

> We understand your desire to move to Nextel Cup next year. There is a danger, however, in advancing too soon. We are recommending that you continue to race full-time in the Busch Series next year with the objective of winning the Driver's Championship. This will be combined with selective drives in the Cup Series that we will arrange for you so that you will be ready for Cup, full time, in 2005. This will allow you to gain valuable Cup experience without the burden and pressures of signing on with a team that might prove to have a negative effect on your long-term career. We strongly believe that a premature, full-time entry into the Cup Series could have negative impact on performance and future marketability of your skills.

> Our relationship with the Cup teams will allow us to assist in placing you with a full-time Nextel Cup drive in 2005. We have legal rights to approve new drivers with all of our first and second tier Teams. That provides ample opportunities for Ford Racing to place you with a first rate Team that can be a successful step in your career. This also gives us, collectively, the time and planning necessary to assure you are compatible with the team, crew chief, team members, and team management.

(*Id.*)

Kahne's position is that because no open full-time rides in the Nextel Cup Series existed with any Ford team and that Ford declined to arrange or offer him a full-time opportunity to race in NASCAR's premier stock car racing series for 2004, (*see* Davis Dep. at 102), the parties (when assuming an enforceable agreement exists) simply failed to negotiate a mutually acceptable series and team. (*See* Def.'s Mot. at 9.)

9

Conversely, Ford characterizes Kahne's actions leading to his agreement to sign with Evernham Motorsports as a "nefarious plan" driven by a more lucrative deal from another racing organization.  According to Ford, rumors of Kahne's potential departure from Ford Racing began circulating in the spring of 2003.  Bill Seaborn of RYR specifically asked Kahne about the rumors in April 2003, but Kahne indicated that he had no plans to leave Ford.  (Seaborn Dep. at 47.)  Despite Kahne's assurances to Seaborn, Ford notes that a faxed copy of the Kahne-Ford 2002 agreement was sent to Kahne's agent with the phrase "mutually acceptable . . ." underscored.  (Pl.'s Resp. Ex. 7.)

Ray Evernham testified that Kahne phoned him and set up an appointment to meet at Evernham's office sometime around Memorial Day 2003.  (Evernham Dep. at 33.)  Kahne met with Evernham and they discussed Kahne's potential interest in driving for Evernham Motorsports.  (*Id.*)  Evernham inquired about Kahne's contractual status with Ford and stated that he "was very clear that - - that [he] didn't want to be in the middle of that."  (*Id.* at 36.)  According to Evernham's testimony, Kahne told him that he did not have "a contractual, binding status with Ford" or that "he had fulfilled all his contractual obligations."  (*Id.* at 36, 37.)  Kahne told Evernham that RYR did not have any racing opportunities for Kahne.  (*Id.* at 39.)

Following this meeting with Kahne at Evernham's office, Evernham was approached by Kahne's agent, on or about June 15, 2003, regarding Kahne's interest in driving for Evernham Motorsports.  (*Id.* at 32, 47-48.)  According to Evernham, he was not interested in Kahne if he had "any contractual obligations" and Kahne's agent informed him that "all [Kahne] had was an agreement to agree and if [Evernham] felt like

10

[he] had something for them, [he] needed to get it on paper and send it to him." (*Id.* at 48.)

Evernham Motorsports ("EMS") responded to the request for "something in writing" by sending a July 11, 2003 "Informal Summary of Evernham Motorsports'[s] offer to Kasey Kahne." (Pl.'s Resp. Ex. 8.)  This informal summary provided that EMS and Dodge would partner with a current Busch team or start a new Busch team with Kahne as the driver and that EMS would enter a third car for Kahne to drive in at least five Nextel Cup races during 2004.  (*Id.*)  Ford maintains that the "current Busch team" referred to by EMS was in fact Akins Motorsports, which at the time was under contract with Ford.

Ford claims that Akins Motorsports was in negotiations with both Kahne and EMS to coordinate Akins's departure from Ford to become a Dodge team and that Akins Motorsports delayed advising Ford of its intentions until October 31, 2003, thus undermining Ford's reasonable assumption that it would be able to place Kahne with the Akins Busch team as a "reasonably competitive" Ford team.  Ford also avers that, notwithstanding Akins Motorsports's departure to Dodge, it secured another competitive racing opportunity for Kahne with ppc Racing to run a NASCAR Busch team.  (Davis Dep. at 273; Pl.'s Resp. Exs. 9 &10.)  Ford's position is that the ppc Racing opportunity with Kahne as a driver did not materialize because Kahne's decision to drive for EMS was publicly released.

Ford claims that Kahne and his agent Moskowitz met with Robert Yates and Seaborn on August 13, 2003 with an offer from EMS already in hand.  Ford claims that the representatives from RYR discussed the potential to run a limited Cup schedule for

11

Kahne in 2004.  (Seaborn Dep. at 51.)  Seaborn testified that Kahne and his agent

seemed to be more interested in getting out of the Yates-Kahne contract than in

reaching a solution.  (*See id.* at 83.)  According to Seaborn, "it was a forgone

conclusion, in his mind, that regardless of what [RYR] may have come up with, his mind

was set.  He was going to go in a different direction."  (*Id.*)  Yates testified that he was

informed that Kahne was going to drive the "No. 9" car for EMS in the 2004 Nextel Cup

season and "there wasn't anything that [RYR] could do about it."  (Yates Dep. at 113,

Pl.'s Resp. Ex. 28.)

        Ford acknowledges that Kahne sent Davis a letter on August 29, 2003 indicating

his desire to move up to Nextel Cup, but notes that Kahne testified that this letter did not

indicate that he was desirous of going to Nextel Cup on a *full schedule*.  (Def.'s Dep. at

204.)  Ford avers that Kahne's desire to move full time to Nextel Cup was discussed

during the Kahne-Davis meeting on September 17, 2003.  (Pl.'s Resp. Ex. 12.)

        Ford also cites a recently obtained e-mail message from Moskowitz to Ray

Evernham dated September 23, 2003.  (*See* Pl.'s Supp. Resp. at Ex. 3.)  The message

discusses proposed changes in Kahne's contract with EMS and states that Kahne is

ready to move forward and finalize the EMS agreement as quickly as possible.  (*Id.*)

Ford notes that this e-mail undermines Kahne's argument that he fulfilled his contractual

obligations because he attempted to negotiate a mutually acceptable racing opportunity

with Ford for the 2004 season within the 30 days as detailed in Kahne's own August 29,

2003 letter.  In Ford's view, this evidence shows that Kahne indicated to EMS that he

was ready to finalize his agreement with the Dodge affiliated team *before* the 30 days of

negotiations with Ford had even ended.  Defendant counters, claiming that nothing in

12

the 2002 Kahne-Ford agreement prevented Kahne from discussing or negotiating with other race teams and that it would have been foolish for Kahne to simply sit around waiting on Ford to provide a racing opportunity that was uncertain at the time.

Ford claims that Davis's September 24, 2003 letter was consistent with the incremental development plan that Kahne had agreed to under his two contracts with Ford and RYR.  (*See* Davis Dep. at 243; Pl.'s Resp. Ex. 3.)  Kahne, unbeknownst to Ford, began negotiating with EMS for a full-time Nextel Cup driving position in September 2003.  After learning that Kahne had commenced serious discussions with EMS, Robert Yates sent a letter to Kahne on October 2, 2003, reminding him that he had a "valid and legally binding contract in place" with RYR.  (Pl.'s Resp. Ex. 15.)  Yates stated that he sent the letter with the intent to keep Kahne under contract and Ford argues that Yates could have put a team together for Kahne under the Kahne-Yates contract.  (Yates Dep. at 91, 93.)  On the same day as Yates's letter, however, Kahne executed his driving services agreement with Evernham Motorsports, LLC.  (Pl.'s Resp., Ex. 16.)

The following day, Kahne executed a "Driver Contract" with Akins Motorsports. (Pl.'s Resp., Ex. 18.)  Under this agreement, Kahne was to drive the "#38 Great Clips Sponsored car in the 2004 NASCAR Busch Series;" this was the same car he had driven for Ford during the 2003 Busch Series.

On October 7, 2003, after he had executed agreements with EMS and Akins Motorsports, Kahne sent a letter to Dan Davis noting that he had not received Davis's September 24, 2004 letter until October 6, 2003 (after he had executed his new contracts) and advising Ford Racing as follows: "As Ford is unable to place me with a

13

full-time Nextel Cup Series team in 2004, which you have once again confirmed in your letter to me of September 24, 2003, I am most sorry to inform you that our Ford contract must be terminated immediately." (Pl.'s Resp., Ex. 19.) Kahne also sent a letter to Robert Yates on October 7, 2003. In this letter, Kahne informed RYR of his understanding that the 2002 Kahne-Yates agreement had been terminated based on RYR's representations made during their August 13, 2003 meeting. The letter provides, in part:

> During our [August 13, 2003] meeting, you told me that RYR would not be running me in a full-time Busch or Nextel Cup Series program in 2004. In my contract with RYR, referenced above . . . RYR was obligated to provide a full-time Busch or Nextel Series Cup ride in 2004 for me as a driver. Relying upon what you told me, I have recently signed an Agreement with Akins Motorsports to run in the Busch Series in 2004. By telling me that RYR would not be fulfilling its obligations with respect to my contract, RYR anticipatorily repudiated our Agreement and therefore, it is my position that our contract was terminated.

(*Id.* at Ex. 20.)

Following Kahne's decision to sign contracts with EMS and Akins Motorsports for the 2004 NASCAR season (and for several seasons thereafter), RYR and EMS executed a November 21, 2003 agreement where RYR agreed to release Kahne from his contractual obligations under the Kahne-Yates agreement "conditioned upon the signing of a Kahne/Ford Motor Company agreement which releases Kahne from his contractual duties to Ford." (Pl.'s Resp. Ex. 24.) RYR, however, has not joined this action nor, to the court's knowledge, has RYR asserted any claim against Kahne under the Kahne-Yates agreement. Indeed, the issue of whether the 2002 Kahne-Yates contract was "voided" or whether RYR could maintain a breach of contract action against Kahne is simply not before the court.

14

Ford is alleging that Kahne is in breach of the 2002 Kahne-Ford agreement. Ford has not asserted claims under the Kahne-Yates agreement, nor argued that it is a party to the Kahne-Yates agreement. Ford claims its 2002 contract for personal services with Kahne is not an unenforceable "agreement to agree," that Kahne and Ford had reached agreement on all material terms, and that Kahne failed to fulfill his obligations under the contract.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of

proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof

of that fact would have the effect of establishing or refuting an essential element of the

claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174

(6th Cir. 1984).

　　　In considering a motion for summary judgment, the court must view the facts and

draw all reasonable inferences from the admissible evidence presented in a manner

most favorable to the nonmoving party.  *Dunigan v. Noble*, 390 F.3d 486,492 (6th Cir.

2004) ("we must determine 'not whether there is literally no evidence, but whether there

is any upon which a jury could properly proceed to find a verdict for the party producing

it upon whom the *onus* of proof is imposed.'")  The court does not weigh the evidence to

determine the truth of the matter, but must determine if the evidence produced creates a

genuine issue for trial.  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

### III.  DEFENDANT'S SUMMARY JUDGMENT MOTION

　　　Defendant makes two arguments in his motion for summary judgment.  First,

Defendant argues that the 2002 Kahne-Ford Racing personal service agreement is

unenforceable under Michigan law because the parties left material terms open and

subject to future negotiation and mutual agreement.  The 2002 agreement expressly

provides that Ford would offer Kahne opportunities to drive in "one or more mutually

acceptable racing series with a reasonably competitive team," and that "[t]he specific

series and team will be determined jointly," subject to five enumerated "considerations."

(2002 Kahne-Ford Racing Agreement, Pl.'s Resp., Ex. 5.)  Defendant argues that this

express language and the testimony of Ford Racing executives Dan Davis and Greg

Specht (who negotiated the contract with Kahne) required subsequent negotiations

16

between the parties on the material terms of the actual racing "series" and the specific "team" that Kahne would work with each year.  As such, Defendant maintains that the entire agreement is unenforceable under Michigan law.

Second, Defendant argues that, even assuming the agreement is enforceable, he has fully satisfied his obligation to negotiate a mutually acceptable racing opportunity for the 2004 racing season.  Specifically, after driving for Ford Racing teams in the NASCAR Busch Series in 2002 and 2003, Kahne requested a full-time driving position with a team that would compete in NASCAR's top series, the Nextel Cup Series.  Kahne argues that Ford refused to provide such an opportunity, precluding a mutual agreement on the "series" and the "team" as contemplated by the 2002 contract.

Plaintiff Ford counters by arguing that the parties' 2002 personal services agreement reflects their agreement on all material and essential terms and that there exists, at least, a triable issue of fact as to whether the parties reached agreement on all material and essential terms.  Ford claims that a reasonable jury could conclude that the parties did not view the "series" or "team" as an open essential term (i.e. that they had agreed on the essential term that Kahne would race in an agreeable series and for a reasonably competitive Ford team).

Ford argues that the contract required Kahne to race for a "team" utilizing "Ford vehicles and/or engines" having sponsors compatible with the business interests of Ford.  (Pl.'s Resp. Ex. 5 at 1.)  It also maintains that the "series" term describes the different racing circuits and cars used in those series.  For instance, Ford lists the following as "series," NASCAR, CART, IRL, or open-wheel" versus "closed-wheel" racing circuits.  It claims that the use of the term "series" by the parties' was not

17

intended to cover the different racing circuits or levels of stock car racing sanctioned by NASCAR (e.g. Nextel Cup versus Busch Grand National versus the Craftsman Truck circuit).  In short, Ford argues that these limitations on any discretion that Kahne had in mutually agreeing on the racing "series" or jointly selecting the Ford "team" for each racing season show that the parties had reached agreement on all material and essential terms and, therefore, the entire agreement is not rendered unenforceable. (Pl.'s Resp. at 8.)

In response to Defendant's second argument in the motion for summary judgment, Ford maintains that Kahne breached his express promise to drive for a Ford team in an agreed upon series and at least violated an implied covenant of good faith and fair dealing in the performance of his contract with Ford that included discretion in reaching agreement on particular non-essential terms.  *See Stevenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003).  Ford claims that Kahne hindered its ability to provide a mutually acceptable racing opportunity by his involvement and negotiation of an agreement with Evernham Motorsports.

The parties agree that this contract is governed by Michigan law.  (Pl.'s Resp. Ex. 5 at 3.)  The primary goal in interpreting contracts under Michigan law "is to determine and enforce the parties' intent."  *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 666-67 (Mich. Ct. App. 2000).  "To do so, [a court] reads the agreement as a whole and attempts to apply the plain language of the contract itself."  *Id.*  "Where a contract is not ambiguous, courts 'are obligated to accept as the agreement of the parties the plain meaning of the words used.'"  *Tel-Tone Properties Group v. Toys "R" Us-Delaware Inc.*,

18

No. 02-1251, 2005  WL 180985, at *4 (Jan. 26, 2005) (quoting *Continental Cas. Co.*, 349 N.W.2d 127, 138 (Mich. 1984)); *see also Stine v. Continental Casualty Co.,* 349 N.W.2d 127, 138 (Mich. 1984).  Courts cannot create ambiguity where none exists. *Auto-Owners Insurance Co. v. Churchman,* 489 N.W.2d 431, 434 (Mich. 1992).

Interpretation of unambiguous contractual language and whether the language is ambiguous in the first instance are both questions of law for the court.  *Nilac Int'l Marketing Group v. Ameritech Servs.,* Inc., 362 F.3d 354, 358 (6th Cir. 2004); *Wilkie v. Auto Owners Ins., Co.*, 664 N.W.2d 776, 780 (Mich. 2003).  Conversely, when the language of a contract is unclear or susceptible to multiple meanings, interpretation becomes a question for the trier of fact.  *Nilac*, 362 F.3d at 358; *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003);  *D'Avanso v. Wise & Marsac*, 565 N.W.2d 915, 917 (Mich. Ct. App. 1997).

"In order to form a valid contract there must be a meeting of the minds on all the material facts."  *Heritage Broadcasting Co. v. Wilson Communications, Inc.*, 428 N.W.2d 784, 787 (Mich. Ct. App. 1988) (citing *Fisk v. Fisk*, 44 N.W.2d 184 (Mich. 1950)).  An enforceable contract does not exist under Michigan law unless there is mutual assent on all essential terms.  *See Eerdmans v. Maki*, 573 N.W.2d 329, 332 (Mich. Ct. App. 1997).  Whether there was mutual assent or a "meeting of the minds" between the contracting parties is a question of fact.  *Martin v. DeYoung*, 205 N.W. 142 (Mich. 1925); *see also Opdyke Investment Co. v. Norris Grain Co.*, 320 N.W.2d 836 (Mich. 1982) ("a contract to make a contract can fail for indefiniteness if *the trier of fact* finds that it does not include an essential term to be incorporated into the final contract") (emphasis added); *Tecorp Entertainment Ltd v. Heartbreakers, Inc.*, No. 209861, 2001 WL 740007,

19

at *2 (Mich. Ct. App. Feb. 9, 2001) (unpublished) ("Whether there was a meeting of the minds between the parties is a question of fact, which is reviewed for clear error.").

In examining this question, the chief goal is to ascertain the parties' intent based on *objective* manifestations of that intent. *Id.* ("A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind."); *D'Avanzo,* 565 N.W.2d at 917; *see also Busch v. Dyno Nobel, Inc.*, 40 Fed App'x 947, 953 (6th Cir. 2002) (applying Michigan law).

Under Michigan law, a "contract to make a subsequent contract [i.e. an 'agreement to agree'] is not per se unenforceable; in fact it may be just as valid as any other contract." *Heritage Broadcasting Co.*, 428 N.W.2d at 787 (citing *Opdyke Investment Co. v. Norris Grain Co.*, 320 N.W.2d 836 (Mich. 1982). As the Michigan Court of Appeals reiterated in *Heritage*: "To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations." *Id.* (citing *Socony-Vacuum Oil Co v. Waldo,* 286 N.W. 630, 632 (Mich. 1939)). "As long as the contract to enter into a future contract specifies the material and essential terms, leaving none to be agreed as a result of future negotiations, its is legally enforceable." *Busch*, 40 Fed. App'x at 954 (citing *Heritage* and *Socony-Vacuum*); *Hansen v. Catsman*, 123 N.W.2d 265, 266 (Mich. 1963) (finding no enforceable agreement when essential term of building plans for a drug store were left for future negotiations and had to be "acceptable to both parties"); *see also* 1 Arthur L. Corbin, Corbin on Contracts § 2.8 (Joseph M. Perillo ed., rev. ed. 1993) ("If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-

called 'contract to make a contract' is not a contract at all.").

The court agrees with Defendant that the 2002 Kahne-Ford personal services agreement is not enforceable under Michigan law. No reasonable jury could conclude, based on the record evidence presented, that the parties had reached agreement on all material or essential terms. First, the clear and unambiguous language of the contract shows that the parties intentionally left the material terms of the racing "series" and "team" for future negotiation and mutual agreement or joint determination. The contract language provides, in relevant part:

> DRIVER (Kasey Kahne) agrees to participate in one or more racing series as a driver of "Ford" branded vehicles and/or Ford powered vehicles. Ford agrees to provide the Driver with opportunities to participate in one or more *mutually acceptable* racing series with a reasonably competitive team. *The specific series and team will be determined jointly* and will be subject to the following considerations . . .

(Pl.'s Resp. Ex. 5 (emphasis added).)

This language makes the selection of Kahne's racing "series" and his racing "team" subject to mutual agreement or joint determination, even if this mutual agreement was also limited by the enumerated "considerations" as Ford maintains.[5] Because the unambiguous language requires future agreement on these terms, the

---

[5] The Kahne-Ford contract at issue in this case does not contain a provision granting Ford the unilateral right to select the racing series or team for the driver. It is conceivable to the court that Ford could enforce a racing services contract containing an express provision reflecting an agreement between Ford and the driver *to attempt* to mutually agree on a series or race team with a driver under contract, while retaining the final decision-making authority on the selection. (*See* Def.'s Mot. Br., Ex. Z.) Here, there is no such contractual provision. The contract at issue states that the parties will jointly determine the racing series and team. Further, it also provides that "[i]n the event that the relationship between DRIVER and the employing Team become unsatisfactory, for any reason, in the opinion of FORD, FORD has the option *together with the Driver*, to place the DRIVER with another series/team." (Pl.'s Resp. Ex. 5 (emphasis added).)

contract fails if they are essential or material terms.

Second, the sworn testimony of Ford's own representative establishes that these contract terms were intentionally left open for future joint agreement by the parties and that these terms were "very important." Davis, who negotiated, drafted, and executed the agreement testified as follows:

> Q: Okay. And although the parties may have understood that Kasey [Kahne] was in fact driving for Robert Yates Racing, this agreement does not concern any specific racing team or racing series, correct?
>> [Plaintiff's Counsel's Objection]: Asked and answered, object to form.
> Q: Correct?
> A: I've answered it.
>
> Q: Well, you can answer it again.
> A: This contract does not indicate what team Kasey will drive for. The contract indicates that we will participate in a mutually acceptable racing series with Kasey.
>
> Q: And the goal of course between the parties– strike that. Ford's goal was to provide an opportunity that would be acceptable to Kasey Kahne, correct?
> A: Absolutely.
>
> Q: You didn't want Kasey sitting on the sidelines, correct?
> A: Absolutely not.
>
> Q: You wanted him in a race car?
> A: We wanted him in a race car which would allow him to grow and develop and show his capability.
>
> Q: Now, you understood it was possible that the opportunities that Ford would offer to Kasey would be unacceptable to Kasey, correct?
> A: Yes. It's possible.

Q: And in that event Kasey was not required to accept those offers?

A: If we could not come to agreement, yes.

(Davis Dep. at 203-04.)

Greg Specht, who assisted in negotiating the agreement, testified that the goal of

the parties was to reach future agreement on the racing "series" and "team" for which

Kahne would drive.  The relevant portion of Specht's testimony follows:

Q: Now, because the team and the series is supposed to be determined jointly, Ford could propose these things to Kasey and he could disagree?

[Plaintiff's Counsel's Objection] Propose what? Object to form of the question.

Q: The way the contract works is Ford offers opportunities to Kasey, and Kasey has the freedom to say I agree or don't agree with that particular team and series, correct?

A: Yeah, if he - - we could say we want you to go drag racing.

Q: And he could say no?

A: And he could say no.

Q: Now, if you said to him I want you to go drag racing, and he says no, and he does not go drag racing, Ford doesn't get the benefit of any marketing exposure from the drag racing activity, correct.

A: Uh-huh, yes.

Q: Now, the goal of the agreement though is for the parties to reach an agreement on these items, correct?

A: Yes.

. . .

Q: Okay.  The second sentence says: Ford agrees to provide the driver with opportunities to participate in one or more mutually acceptable racing series with a reasonably competitive team.  Do you see that?

A: Yes.

23

Q: Okay.  Then the sentence after it says that the specific series and team would be, quote, determined jointly, close quote.  Do you see that?

A: Yes.

Q: The reference to a joint determination, that refers to a joint determination between Ford and Kasey Kahne, correct?

A: Yes.

Q: Both of you had to agree, correct?

A: Yes.

Q: Okay, And am I correct, this agreement does not specify any particular racing series or team, correct?

A: Correct.

Q: Okay.  Those terms would be determined in the future?

A: Well, we had already discussed it.

Q: Right.

A: Whether it was going to be - - well, at this time, we were - - it was - - well, when we - - inception of developing this document, Kasey still wasn't sure whether he was going to go open wheel or stock car.

Q: Okay.  And so that's - -

A.  We wanted to jointly agree, okay, which series are you going to go into.

Q: Got it. Okay. So that was left open for the parties to determine?

A: Uh-huh.

Q: Okay.  You also had not designated the specific team at that time, right?

A: Correct.

Q: And that's why you wanted to leave the team open, correct, so that the parties could agree on that term later?
A: Uh-yes.

(Specht Dep. 166-67, 162-64.)

Specht also testified that these open contract terms, selecting an appropriate "series" and Ford "team" were "very important" to both Ford and to the driver.  (*Id.* at 127.)  Likewise, Davis testified that Ford spends a lot of time matching the driver with the right car owned by the right racing team and that this decision is very important, even acknowledging that it "can be an essential thing to a driver."  (Davis Dep. at 33-34, & 35.)  Davis explained that the parties intended the term "series" to mean different types of racing (e.g. open-wheel racing circuits versus stock car racing circuits) and not the various series or levels within NASCAR sanctioned stock car racing (e.g. Nextel Cup versus Busch Series versus Craftsman Truck Series).  (Davis Dep. at 226-28.)  Davis explained that Kahne and Ford had already mutually agreed on NASCAR stock car racing as the racing "series."  But he also stated that leaving open (and subject to mutual agreement) the "series" and "team" for which Kahne would drive permitted Kahne to "move around" or "change his mind."  (*Id.* at 227.)

In addition, no reasonable jury could conclude that the selection of the "series" or Kahne's racing "team" was non-essential term in the parties' agreement.  There is nothing in the record to suggest that selection of the racing team for Kahne as a professional race car driver was a non-essential term of contract for driving services.  Indeed, Dan Davis's September 24, 2003 letter to Kahne recognizes that it takes time and planning to ensure a driver is "compatible" with "the team, crew chief, team

25

members, and team management."  (Pl.'s Resp. Ex. 12.)  The selection of a team includes a crew chief with whom the driver works to improve the car before and during each race at multiple tracks.  Race teams also vary in terms of their relative financial resources, technical and engineering support and resources, testing data on various tracks where races will be run, and (as demonstrated by Yates testimony) in which circuits that they run.  For example, there are several racing organizations participating in NASCAR sanctioned racing series with multiple cars that share information between their race teams (so-called "multiple car teams") such as Roush Racing, Inc., Hendrick Motorsports, Joe Gibbs Racing, EMS, and RYR.  Roush Racing, Inc. and RYR, both organizations using Ford vehicles, are prime examples.  *See, e.g.*

*http://www.roushracing.com/sponsorship/default.asp;* (Yates Dep. at 76-77.)[6]

---

[6] A July 13, 2005 excerpt from the Roush Racing website cited above and titled "On-track Performance" supports the court's observation that economies of scale may have a direct impact on the quality or nature of his racing "team," including which Ford-affiliated team.

> Roush Racing is the largest and most successful motorsports team in the United States.  With more than 280 wins and 30 championships, Roush Racing has an unmatched historical record of competitive success on the race track in every racing series in which we have ever entered.  Some highlights of our success include winning at the 24 Hours of Daytona ten straight years, winning more races in NASCAR Busch Grand National competition than any other race team, a NASCAR Craftsman Truck Series Championship in 2000, a NASCAR Busch Series Championship in 2002, and the 2003 and 2004 NASCAR Nextel Cup championships.

> Of course, no success is possible without talent and resources.  Through the years Roush Racing has employed only the most talented and determined drivers to pilot our race cars. Our current stable of Mark Martin, Matt Kenseth, Kurt Busch, Greg Biffle, Carl Edwards, Ricky Craven and Todd Kluever ranks as our most talented and successful group ever.  *Our race teams have access to all of the resources of our parent company, Roush Industries, Inc.*

> *The established infrastructure of engineering talent, development and test*

Ford cannot dispute that NASCAR Nextel Cup teams, sponsors, and drivers receive more media exposure than their counterparts competing in the NASCAR Busch or Craftsman Truck Series.  The Kahne-Ford agreement also made the Ford race "team" his employer, thus further supporting the conclusion that where Kahne would be employed was an essential term of the parties agreement.  (Pl.'s Resp. Ex. 5 ("The DRIVER will be employed by the Team.").)

Most importantly, Ford has failed to identify sufficient evidence from which a reasonable jury could conclude that it and Kahne did not view which "series" or racing "team" he would drive for as a material or essential term of the contract.  Even if, as Ford argues, the contract limited Kahne to Ford or Ford-approved "reasonably competitive" race "teams," the selection of such a Ford race team was still an open and essential term of the contract that was to be determined jointly, and there is insufficient evidence for a reasonable jury to conclude otherwise.

Ford claims that the parties dispute the meaning of "series" and there is at least ambiguity in what the parties' intended this term to mean under their agreement.  Ford

---

*resources, and machinery and equipment that Roush Industries provides is geometrically larger and more comprehensive than that of anyone else in NASCAR. Roush Racing has the leaders to take advantage of the available resources to find success.*

Led by owner Jack Roush, who is the most experienced and brightest manager in the sport, Roush Racing has a proven philosophy to provide each team member with whatever resources and assets are necessary to place that team in a position to maximize its potential.  *Through the efforts of nine teams pursuing their greatest potential, the Roush Racing multiple team effort continues to allow Roush Racing to make competitive advancements at a rate that outpaces our competitors and will lead to continued on-track success.*

www.roushracing.com/sponsorship/default.asp (emphasis added).

has presented evidence that "series" was meant by the parties to refer to a type of racing as opposed to the various types of NASCAR series.  (*See* Davis Dep. at 226-27; Pl.'s Supp. Br. Ex. 3); (Pl.'s Resp. Ex. 4.).  Conversely, Defendant argues that NASCAR is merely a sanctioning body for several racing circuits and that it cannot be its own "series."

Ford's evidence and the parties' dispute on the meaning of this term, however, merely creates ambiguity as to the competing meanings attributed to the "series" term; it does not provide a basis for a reasonable jury to conclude that the "series" term (which was intentionally left open) was a *non-essential* term of the contract.  Even when adopting Ford's position on the meaning of "series" under the contract, the "series" term is still essential to the parties agreement for driving services.  Indeed, whether Kahne would race open-wheel or stock cars is the decision upon which the entire contract, and all subsequent efforts by the parties, is predicated.  The selection of a race team and the finding of suitable racing circuit for Kahne was wholly dependent on this term of the parties' agreement.  It is undisputed that this term was intentionally left open and was subject to change as explained by Davis and Specht, Ford's own representatives.  It flies in the face of common sense to maintain that this term is "non-essential" and Ford's own executives establish that it was left open by the parties.

Ford relies on *Opdyke Investment Company v. Norris Grain Company* to argue that a genuine triable issue of fact remains regarding the parties' mutual assent on all essential terms.  Ford points to the "consideration" that states: "The Team selected will utilize Ford vehicles and/or engines and will have sponsors compatible with the business interests of FORD."  (Pl.'s Resp. Ex. 5.)  Thus, in Ford's view, the joint

28

determination of the race team by Kahne and Ford is limited to reasonably competitive teams using Ford vehicles or engines.  This limitation on the parties' discretion in jointly selecting a team, however, does not eliminate the requirement under the agreement for both the parties to jointly agree on the specific Ford racing team.  Ford claims that this evidence and the fact that Kahne had agreed to give RYR the contractual right to select Busch or Nextel Cup in the 2002 Kahne-Yates concurrent agreement, supports a reasonable jury finding that the parties' viewed the team either non-essential or fixed to reasonably competitive Ford race teams.  The court disagrees.

As explained above, no reasonable jury could conclude that the race team employing Kahne was a settled or non-essential term of the parties' agreement.  That Yates had the contractual right to determine the NASCAR series in which Kahne would participate while racing for RYR is of no consequence to whether Ford left this material term open for future negotiation.  The Kahne-Yates agreement is a separate contract not being sued on in the present action.  In fact, the language attributing the contractual right for Yates to determine which NASCAR series to run shows that RYR and Kahne believed that the particular series within NASCAR sanctioned stock car racing was material in their agreement.

Ford's reliance on *Opdyke* is also not persuasive.  The *Opdyke* case arose out a failed plan to build a new sports arena in Pontiac, Michigan to house the Detroit Red Wings of the National Hockey League.  *Opdyke*, 320 N.W.2d at 837.  The plaintiff in that case alleged that the defendants breached a binding contract to jointly develop the arena on property owned by the plaintiff when the defendants abandoned the joint development plan in favor of building the Joe Louis Arena in the City of Detroit.  *Id.*  The

29

plaintiff alleged that the essential terms of the contract were embodied in a letter of intent. *Id.*

The trial court judge granted the defendants' motion for summary judgment, holding, *inter alia*, that the letter of intent was nothing more than an unenforceable agreement to agree. *Id.* at 838. The Michigan Court of Appeals affirmed the trial court's ruling and the plaintiff appealed to the Michigan Supreme Court. The Michigan Supreme Court overruled the lower court, finding that the there was sufficient evidence to create a triable issue of fact on whether the parties had reached agreement on all essential terms. *Id.*

The parties had not included the precise construction site for the planned stadium on the agreed upon the 117-acre parcel of land and the court reasoned that the evidence presented was sufficient for a reasonable jury to find that the parties intended to be bound "to a reasonable good-faith selection of the arena site." *Id.* at 842. The *Opdyke* court, however, specifically explained that it was "evident that the parties did not regard the precise construction site within the plaintiff's 117-acre parcel as an essential term of their agreement." *Id.*

Ford analogizes the mutual selection of a "series" and a race "team" for Kahne under the current contract to the selection of the precise construction site on the parcel of land in *Opdyke*. The analogy fails for several reasons. First, unlike in *Opdyke* there is no "evident" indication that the parties did not regard the selection of the series or of Kahne's race team as essential terms. Indeed, Ford's own representative Greg Specht, testified that the selection of the team was "very important" to both Ford and the driver and that Ford spent significant time in making such a decision. (Specht Dep. at 127.)

30

Second, the analogy is not persuasive in the context of a contract for professional

driving.  Unlike the one-time selection of the precise location for building the stadium,

the selection of the race team under the Kahne-Ford agreement triggered an ongoing

employment relationship with the team selected, its management, and working

relationships with the team's crew chief and its crew members.

The terms left open for future agreement in this case are closer to those left open

in *Hansen v. Catsman*, 371 N.W.2d  265 (Mich. 1963).  In *Catsman*, the plaintiff alleged

that he and defendants entered into a contract whereby a realty company, in exchange

for rental payments, would erect a drug store.  *Id.* at 266.  The agreement provided that

the Defendant contemplated erecting the drug store and that the plaintiff contemplated

leasing the store.  *Id.*  When the defendant backed out of the plan, the plaintiff sued and

the trial court determined that the parties' agreement was not an enforceable contract.

*Id.*  The Michigan Supreme Court affirmed, ruling that the parties agreement was

unenforceable because it left several essential terms for future negotiations, explaining:

> Regarding the agreement in the present case, several essential terms
> were left for future negotiations, such as, for example, the requirement
> that plans, etc., be acceptable to both parties.  It was stated in the
> agreement, that plans were not, as of the time of signing, formalized.  This
> left, perhaps, the most significant feature of the venture open for further
> discussion and negotiations.  In a like manner, the instrument additionally
> supports this construction in its provision for forfeiture 'if for any
> reasonable reason the plans, specifications and design are unacceptable
> to either party.'  What may constitute a 'reasonable reason' is left to
> conjecture.  At the very least, it is a matter for future negotiations, within
> the proscriptions of the Socony-Vacuum Case, supra.

*Id.* at 267.  The Court also found that the use of the word "contemplates" provided

another reason to find that the agreement not enforceable, as this demonstrated that

the agreement was simply a memorandum of intentions.  *Id.*

Here, the selection of the specific "series" and racing "team," like the plans for the drug store in *Catsman* were significant and essential terms that the parties left for future negotiations and agreement.  In fact, the selection of the "series" and race "team" was "the most significant" feature of the parties' contract for professional driving services. Because the court finds that no reasonable jury could conclude that Kahne and Ford reached agreement on all essential terms, the professional services agreement between them is unenforceable under Michigan law.

Finally, during oral argument, Ford argued that the "series" and "team" terms were not left open because Kahne and Ford had agreed on NASCAR as the "mutually acceptable" series and that the parties had agreed on a "reasonably competitive team" for joint selection.  Ford's "series" argument misses the mark, however, because (as Ford's own executives explained) Kahne was free to move between series under the terms of the agreement.  The uncontroverted evidence establishes that this term was left open for future agreement and that Kahne could move around.  (*See* Davis Dep. at 227-28.).

Ford's argument that the parties agreed for Kahne to race with a "reasonably competitive" Ford team is also without merit.  The contract stated that Ford would provide Kahne "with opportunities to participate in one or more mutually acceptable racing series with a reasonably competitive team."  (Def.'s Mot. Ex. H.)  When reading this language in isolation, one could argue that "mutually acceptable" modifies only the "series" and not the reasonably competitive team.  However, the very next line in the contract states that "[t]he specific series *and team* will be determined jointly and will be

32

subject to the following considerations." (*Id.* (emphasis added).)[7] This unambiguous statement requiring joint selection of the team, coupled with the testimony of Davis and Specht cited above, permits but one conclusion: the selection of the team was subject to mutual agreement (even if limited by the objection component of being a "reasonably competitive team").

For the reasons explained above, the court will grant Defendant's motion for summary judgment.

## IV.  PLAINTIFF'S MOTION TO AMEND

Also pending before the court is Plaintiff's June 6, 2005 "Motion for Leave to File First Amended Complaint."  Ford seeks permission to amend its complaint to allege a claim of unjust enrichment against Kahne.  Because Plaintiff seeks to amend its complaint after several deadlines in the court's Rule 16 scheduling order have passed, Plaintiff must meet the requirements under Federal Rule of Civil Procedure 15 and establish good cause pursuant to Federal Rule of Civil Procedure 16.  *Leary v. Daeschner*, 349 F.3d 888, 904-06 (6th Cir. 2003).

Ford has failed to establish good cause under Rule 16 to support an amendment of the court's scheduling order.  Under the court's October 6, 2004 scheduling order, the

---

[7] One of the "considerations" under which the parties were to jointly determine the race team specifically buttresses the conclusion that the determination would have to made jointly.  "In the event that the relationship between DRIVER and the employing Team become unsatisfactory, for any reason, in the opinion of FORD, FORD has the option *together with the Driver*, to place the DRIVER with another series/team."  (Pl.'s Resp. Ex. 5 (emphasis added).)  Under this provision, if Kahne and the team selected jointly developed internal or other problems, Ford *and Kahne* had the option to find another team.  This language comports only with an agreement to jointly determine the specific series and team.

summary of deadlines states that "amendments" were due by February 3, 2005.  Ford

correctly notes that the corresponding text in the scheduling order relates to motions to

add an indispensable party under Federal Rule of Civil Procedure 19, and does not

specifically apply to its motion to add a new theory for recovery.  (Pl.'s 07/19/05 Reply at

2.)  The extended discovery cutoff deadline and the dispositive motion deadline,

however, have also passed in this case.

The court's extended deadline for completing discovery was April 29, 2005.

Defendant also filed its motion for summary judgment on May 12, 2005.  Only now has

Ford sought leave to amend its complaint to allege a new legal theory for recovery.

Accordingly, to allow amendment to add a new legal theory in this case would require

the court to not only overlook the spirit of the deadline for filing amendments by

February 3, 2005 (as indicated in the summary of deadlines contained in the scheduling

order), but would also require the court to alter its unambiguous Rule 16 deadlines for

discovery and for the filing of dispositive motions.[8]

_____

[8] The court is not convinced that discovery would not have to be re-opened to
permit this late amendment of the claims asserted.  Indeed, Kahne would at least be
entitled to explore Ford's theory of damages that would accompany its new unjust
enrichment claim.  During the hearing on July 20, 2005, Ford suggested that the unjust
enrichment measure of damages would be the amount Kahne was paid by the Dodge
affiliated teams less the amount that Ford would have had to pay him under the
remaining years of the Ford-Kahne personal services agreement.  Defendant, however,
would be entitled to challenge this theory.  Moreover, Defendants would be entitled to
discovery on the value of Kahne's services for the years in question (including the
naming of experts) and to discovery on all parties who benefitted from Ford's
investment.  In addition, Ford's delay in presenting its motion to amend cannot be used
deprive Defendant of at least the opportunity to file a dispositive motion.  Because the
court's Rule 16 deadlines have expired, good cause is required to alter the scheduling
order.

Under Michigan law a contract will not be implied by law to prevent unjust enrichment when an express contract already addresses the pertinent subject matter. *Liggett Restaurant Group, Inc. v. City of Pontiac*, 676 N.W.2d 633, 639 (Mich. Ct. App. 2003). Rule 8 of the Federal Rules of Civil Procedure, however, permits a plaintiff to plead in the alternative, even if the claims are inconsistent. Fed. R. Civ. P. 8(e)(2). Plaintiff now seeks to plead an unjust enrichment claim in the alternative, i.e. in the event its contract with Kahne is void ab initio.

The court will deny Plaintiff's motion, however, because Ford offers no good cause for why it could not have pleaded this claim initially, or at least *well before* this late stage of the case, following the end of discovery and the filing of Defendant's dispositive motion. Defendant's theory that the agreement at issue was an unenforceable agreement to agree has been no secret. In fact, Defendant asserted this position in his July 14, 2004 answer and Defendant's counsel has repeatedly indicated that this would be a basis to seek dismissal and/or summary judgment of Ford's breach of contract case. The parties proceeded through discovery on the current allegations of breach of contract and the court will not permit Plaintiff a second bite at the apple.

Examining Sixth Circuit precedent supports the court's determination. In *Tucker v. Union of Needletrades*, 407 F.3d 784 (6th Cir. 2005), a former employee sued her former employer, the union, and her former union for failing to arbitrate her grievance that she filed after being discharged. *Id.* at 785-86. The plaintiff alleged a hybrid claim under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 and argued that she was an employee covered by a collective bargaining agreement. *Id.* at 786.

Approximately one year after the plaintiff had filed her complaint, the defendants moved for summary judgment, arguing that the plaintiff was not covered by the collective barging agreement at the time of her discharge.  *Id.*  In her response to the dispositive motion, the plaintiff claimed that Defendants were bound by the doctrine of promissory estoppel to the terms of the CBA.  *Id.*  Plaintiff, however, had not initially pleaded a promissory estoppel claim nor sought leave to amend her complaint to add this new theory before responding the defendants' summary judgment motion.  The district court granted the defendants' motion and the plaintiff appealed.

On appeal, the plaintiff contended that the district court erred by refusing to consider her promissory estoppel claim under the liberal standards of the notice-pleading regime established by the Federal Rules of Civil Procedure.  *See Minger v. Green*, 239 F.3d 793, 799 (6th Cir. 2001).  The Sixth Circuit, rejected this argument and affirmed the ruling of the district court.  It explained:

> Once a case has progressed to the summary judgment stage, . . . "the liberal pleading standards under *Swierkiewicz* and [the Federal Rules] are inapplicable."  *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir.2004) (holding that a plaintiff could not raise a new claim in response to a summary judgment motion); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp.2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.  At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).").
>
> To permit a plaintiff to do otherwise would subject defendants to unfair surprise.  *See Guiffre v. Local Lodge No. 1124,* No. 90-3540, 1991 WL 135576, at *5 (6th Cir. July 24, 1991) (unpublished) (refusing to hear claims raised for the first time in opposition to summary judgment because, "[h]aving received no notice of them, the defendants had no opportunity to investigate them when they conducted their own discovery"); *see also EEOC v. J.H. Routh Packing Co.,* 246 F.3d 850, 854

36

(6th Cir.2001) (stating that even under the liberal notice-pleading regime, the Federal Rules of Civil Procedure still require "that the complaint give the defendant fair notice of the claim and its supporting facts").

*Id.* at 788.

Moreover, in *Priddy v. Edelman*, the Sixth Circuit unambiguously stated: "A party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories in an amended complaint." 883 F.2d 438, 446 (6th Cir. 1989); *see also Wade v. Knoxville Util. Bd.*, 259, F.3d 452, 459 ("When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier.") (citing *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)).  Courts have also found that significant prejudice is caused by permitting a party to add a claim to its pleading after discovery has ended and after dispositive motions have been filed.  *See Wade*, 259 F.3d. at 459 (finding no abuse of discretion when district court found untimely motion to amend would cause significant prejudice when discovery had ended, the defendant had filed a summary judgment motion, and defendant would have to develop new defense); *Duggins*, 195 F.3d. at 834 ("At least one Sixth Circuit decision has held that allowing amendment after the close of discovery creates significant prejudice, and other Circuits agree.").

Despite being placed on notice that Defendant would be arguing that the parties' contract was void ab initio as an unenforceable agreement to agree throughout the pleading and discovery phase of this case, Ford did not seek leave to add its alternative

37

theory.  Instead, it waited until after discovery had closed and after a motion for summary judgment was filed.  Because there is no good cause for Ford's delay and Defendant would be significantly prejudiced by this late amendment, it will not be permitted.  *See Leary*, 349 F.3d at 904-06 (district court did not abuse its discretion in denying motion for leave to amend complaint where the plaintiffs sought to reformulate their due process claims for injunctive relief as monetary damages claims based on breach of the collective bargaining agreement after the deadline for amendments had passed and when the plaintiffs had been aware of the basis for the claim for many months but had failed to pursue it until after it was brought to their attention by an adverse summary judgment motion).

In addition, the court finds that Plaintiff's complaint, as it currently exists, fails to state a claim for unjust enrichment.  Plaintiff's entire complaint focuses on the alleged breach of contract by Kahne.  The only mention or hints of "unjust enrichment" are found in isolated paragraphs, paragraph number 11 where Plaintiff alleges that it "has been denied the benefits of the bargain that were to be derived from *the Contract* and Kahne has been unjustly enriched *as a result of his breach of it*," (Pl.'s Compl. at ¶ 11 (emphasis added)), and the final paragraph where Plaintiff alleges that "Kahne's *breach*" caused it damages.  (*Id.* at ¶ 15 (emphasis added).

There is simply no short and plain statement of an unjust enrichment cause of action in Ford's complaint.  The passing references to "unjust enrichment" in the complaint relate entirely to the alleged breach of contract and do not put Defendant on reasonable notice of a separate and alternative cause of action for unjust enrichment.

## V.  CONCLUSION

IT IS ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 41] is

GRANTED and Plaintiff's "Motion for Leave to File First Amended Complaint" [Dkt. # 60

& # 61] is DENIED.

S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 28, 2005

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, July 28, 2005, by electronic and/or ordinary mail.

S/Lisa G. Teets
Case Manager and Deputy Clerk
(313) 234-5522